### In re Anonymous 31 D.B. 80

Disciplinary Board Docket no. 31 D.B. 80

## REPORT OF HEARING COMMITTEE

### I. STATEMENT OF CASE

Respondent [   ], is an attorney admitted to practice law in the Commonwealth of Pennsylvania who has maintained offices in [   ] County and whose residence is located at [   ] in that County.

Initiated by a complaint on or about October 2, 1979, to the Disciplinary Board by [A], D.C., Ph.C., a chiropratic practitioner (hereinafter referred to as [A]) and proprietor of [A] Chiropratic Offices, a petition for discipline was filed by the Office of

Disciplinary Counsel against [respondent] Esq., (hereinafter referred to as [respondent]) on May 28, 1980, and served upon him personally on June 6, 1980. The petition charged [respondent] with violation of the following Disciplinary Rules of the Code of Professional Responsibility: D.R. 1-102(A)(4), D.R. 6-101(A)(3), D.R. 9-102(A), D.R. 9-102(B)(4), and requested a hearing pursuant to Rule 205 of the Pennsylvania Rules of Disciplinary Enforcement. On June 23, 1980, [respondent] filed with the Disciplinary Board a document labled "Answer to Petition for Discipline," including a section labeled "New Matter." On June 24, 1980, Chief Disciplinary Counsel wrote to [respondent] to advise that Rule 208(b)(3)(4) of the Pennsylvania Rules of Disciplinary Enforcement does not provide for pleadings other than a petition and answer and, thus, no reply would be filed to new matter. On June 25, 1980, the matter was referred to hearing committee [ ] for appropriate action.

Subsequently, at the request of Assistant Disciplinary Counsel; [ ] Esq., as chairman of the hearing committee, scheduled a pre-hearing conference on September 4, 1980, at the Disciplinary Board's office in [ ], Pa., which produced a stipulation as to some of the relevant facts alleged in the petition.

The hearing committee set April 29, 1981, at 10:00 a.m., in the Disciplinary Board's office in [ ], Pa., as the time and place for hearing on this petition as well as another petition filed against [respondent] at no. 53 D.B. 80, and hearing before the full committee was held as appointed. At the conclusion of petitioner's case, the motion of counsel for [respondent] for dismissal was denied, whereupon [respondent's] counsel made an opening statement, but offered no further evidence. A

transcript of testimony, hereinafter referred to in abbreviated form as "T" was filed on May 28, 1981, after which briefs were submitted on behalf of petitioner and respondent.

## II. PROCEDURAL MATTERS

1. Petitioner's objection was overruled to the question to witness [B] on cross-examination: "Q. What did you understand [respondent] to mean when he said that [C] had made off with his money?" 2. Petitioner's objection was overruled to a line of questions to witness [B] on cross-examination ending with: "Q. Did you receive any communication from [disciplinary counsel] or anybody else from the Disciplinary Board in the form of correspondence, a letter?" 3. Petitioner's motion to strike certain questions to and answers of witness [B] on cross-examination was denied. 4. Petitioner's objection was sustained to a question to witness [B] on cross-examination: "Q. Do you have any complaint about the services [respondent] rendered to you?" However, there was no motion to strike the answer. 5. Petitioner's objection to admission into evidence of respondent's Exhibit "B" was overruled. 6. At the conclusion of petitioner's case in chief, respondent's motion to dismiss the petition was denied.

## III. FINDINGS OF FACT

A. By admission and stipulation:

1. Petitioner, whose principal office is located at [ ], Pa., is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of

Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

2. Respondent, [ ], Esq., is an attorney admitted to practice law in the Commonwealth of Pennsylvania, who has maintained offices in [ ] County, and whose residence is located at [ ].

3. On or about May 16, 1975, [B] suffered personal injuries and property damage to her vehicle as a result of involvement in an automobile accident, in which the other vehicle involved was operated by [D], who was insured by Aetna Insurance.

4. Shortly thereafter, respondent, either personally, or through his agent, [C], undertook to represent [B] in regard to the matter:

(a) Respondent or [C] eventually arranged for settlement of [B's] claim in the total amount of $2,334.23, which included payment of approximately $109.23 for property damage (which amount she received about June 17, 1975), and $2,225 as settlement for her personal injuries;

(b) On September 9, 1975, [B] signed a full and final release of [D], in consideration of current payment to her of $2,225;

(c) On September 9, 1975, Aetna issued a draft for $2,225 payable to "[B] & Attorney [respondent]," which [C] received not later than about September 12, 1975.

5. By a "settlement statement" which [B] signed on or about that date, she approved for distribution from the $2,225 currently received an amount of $778 for legal fees, $443.50 for "[A] Chiropratic" and sums of $38 and $2 for miscellaneous medical expenses, leaving a "net amount" due her of $963.50:

(a) A copy of a bill from "[A] Chiropractic Offices" to [B] in amount of $443.50 dated August 22,

1975, and the original or a copy (showing signature) of the "settlement statement," were placed in respondent's case file on this matter by [C];

(b) The only money which [B] received from the $2,225 settlement then being paid was the sum of $963.50

6. At this time respondent maintained a so-called "Trustee Account" at Equibank, N.A., checks for which were imprinted "Trustee Account", [respondent], [C].

7. Prior to September 20, 1975, this account could be drawn upon either by respondent or [C].

8. [C] was not a lawyer and had not attended law school.

9. Respondent was the subject of a previous disciplinary proceeding at no. 39 D.B. 77, relating in part to his activities in connection with [C] as a result of which proceeding he was subjected to discipline:

(a) In connection with respondent's activities with [C], it was found that he had violated D.R. 3-102(A) and D.R. 3-103(A), by sharing legal fees with a non-lawyer, and by forming a partnership with a non-lawyer, activities of which partnership included the practice of law;

(b) Part of the integral findings in that proceeding were to the effect that in early 1975 respondent and [C] had opened a "Trustee" checking account and a "General" checking account, both for the use of the practice, which accounts were joint, one signature, with right of survivorship, which findings were never challenged by respondent;

(c) The said "Trustee" account, identified therein as petitioner's Exhibit 8, was the same account as the "Trustee" account identified above;

(d) The "General" checking account, identified

therein as Petitioner's Exhibit 7, was a checking account in Equibank, N.A.

10. The Aetna settlement check for $2,225 was deposited in the "Trustee" account on September 12, 1975:

(a) On that same date, [C] drew a check on the "Trustee" account for $778, payable to "[respondent], general account," which was deposited the same day into the said "General Account;"

(b) On the same day, [C] drew a check on the "Trustee" account for $963.50, payable to [B], annotated "Settlement on [D]."

11. [C] left his employment in connection with respondent not later than September 20, 1975.

12. On September 24, 1975, respondent caused control of the "Trustee" account to be transferred to himself and the authorized drawers thereon then became himself and/or [E] who later became respondent's wife.

13. Similarly, not later than September 30, 1975, respondent caused control of the "General" account to be transferred to himself, to the exclusion of [C].

14. A periodic bank statement on the "Trustee" account, dated September 16, 1975, showed the deposit thereto of the $2,225 Aetna settlement check, and the charge against the account on September 12 for the $778 check for legal fees.

15. The periodic statement for the "General" account dated September 30, 1975, showed thereon the deposit on September 12 of the $778 check for legal fees.

16. On or about October 2, 1975, Dr. [A] proprietor of "[A] Chiropractic Offices," wrote and sent, and respondent received, a letter which referred to a prior mailing of a "final statement" to respondent on August 22, 1975, for professional

services rendered by [A] to [B], noted that payment had not yet been made to [A] regarding the account, nor any reply made to that prior communication, and requested explanation as to why payment had not been made or if there were some reason for delay.

17. The periodic statement for the "Trustee" account dated October 20, 1975, addressed to "[respondent] or [E]." at the same street address as previous such statements, showed on its face a charge against that account on September 18, 1975, for the $963.50 settlement check issued to [B], and the said statement included therewith the cancelled check in that amount, which had been negotiated by [B].

18. (a) On or shortly after October 20, 1975, respondent was aware that the said funds had been withheld and that Dr. [A] had made demand for the same;

(b) As of October 20, 1975, there was a balance of $1,700.30 in the said "Trustee" account which had been the initial depository of the $2,225 current settlement, and which account must be considered to have held the residue of the settlement which was not disbursed;

(c) Thereafter, respondent so used that account as to draw the balance available therein below the figure of $443.50

19. Not later than about June 15, 1977, respondent had personally acknowledged to Dr. [A] that he was personally responsible for the $443.50 in funds which had been withheld from [B] in regard to her settlement, and that he would personally remit that amount to [A] on account of [A's] bill against [B].

B. Not by admission or stipulation:

20. [B] did not discuss money with [respondent]

from the time of her settlement in September of 1975 until he telephoned her in 1979 to advise her of [A's] complaint to the Disciplinary Board.

21. In March of 1979, [respondent] gave [B] an envelope containing $443.50 in cash for [A], asking her to hold the money until he was ready to release it, after [A's] complaint to the Disciplinary Board was settled or until [A] demanded payment from her. Except for this episode, [B] did not ask [respondent] any further questions about the lack of payment to [A] from 1975 until 1979.

22. [B] never received any bills or calls for payment from [A's] office for his professional services rendered between May 20, 1975, and August 22, 1975, until September, 1980, and she first learned of the non-payment by [respondent's] call in March, 1979.

23. [respondent] told [B] that [A] had not been paid because [C] had taken her money.

24. In September 1980, [A's] nurse demanded payment from [B] and that demand was followed by a letter enclosing a bill for services. [B] then contacted [respondent] who told her to make payment with the cash he had previously given her.

25. [B] deposited in her checking account te $443.50 from [respondent] and paid [A] in full by check dated November 4, 1980, respondent's Exhibit "A" which was negotiated.

## IV. DISCUSSION

This matter was not initiated by a disgruntle client but rather by the client's chiropractor who was not paid for five years for his services. Provision had been made for his payment from the client's funds retained by her attorney, [respondent], in his trust account, but the attorney failed to make payment. Meanwhile, the balance in the

trust account was drawn down to less than the client's $443.50.

During most of the five year period, the client received no demand for payment and, in fact, did not know of the delinquency until so advised by her attorney, [respondent], in March of 1979. [A's] collection efforts, if any, had been directed toward the attorney rather than his patient. In March of 1979 [respondent] contacted his client, advised her of the non-payment to [A] and the resulting complaint to the Disciplinary Board. He readily ackowledged that the debt was to be paid from the client's funds entrusted to him in 1975 and explained that his associate, [C], a non-lawyer, had misappropriated the money. Shortly thereafter [respondent] delivered to his client $443.50 in cash, asking her to hold it until the complaint was disposed of or until [A] demanded payment of her. When such demand was made in September, 1980, [respondent] told the client to pay [A] with this cash. A few weeks later she deposited the cash in her account and paid the bill in full by check. She is apparently satisfied with [respondent's] services; she voices no complaint against him.

[Respondent] has already been disciplined at no. 39 D.B. 77 for his unauthorized relationship with [C].

[Respondent's] counsel argues persuasively that (a) the client is satisfied; (b) the Disciplinary Board is being used as a bill collector by a third party; (c) [Respondent] has already been disciplined for his unauthorized business relationship with [C] who was not an attorney admitted to practice. Assuming that he is correct on all three points, this does not necessarily dispose of the petition.

We do not believe that the rules restrict a complaint to being a dissatisfied client. Certainly any-

one with knowledge or suspicion of an attorney's wrongdoing should and does have the right to complain to the Disciplinary Board, without regard to the complainant's motive or the client's satisfaction. Once informed, the Disciplinary Board must proceed to determine if there are grounds for disciplinary proceedings. We trust that Disciplinary Counsel will not permit the whole process to be subverted to bill collecting.

Nor does the prior disciplinary action necessarily rule out further complaints growing out of the [C] incident. Again, if [respondent] has been disciplined for permitting a non-lawyer access to clients' trust funds, we should hope that he would not again be separately disciplined for each and every client wronged by that unauthorized act.

But one thing is clear, viz., by his own admission, after [C] left, [respondent] permitted the balance in his trust account to become less than the $443.50 he held in trust for [B]. Perhaps in so doing he breached his traditional ethics or some of the Codes of Professional Responsibility, but at no time did he fail to pay to the client, *as requested by the client*, her funds in violation of D.R. 9-102(B)(4). The record is devoid of any hint that [B] ever requested payment of her funds, either to herself or to [A]. The uncontroverted evidence demonstrates that from 1975 to 1979 she did not even know that her $443.50 had not been used to pay [A], and she learned it from [respondent] himself who almost immediately delivered to her $443.50 in cash. Although we have serious reservations about [respondent's] handling of this matter, we are here only considering the formal charges made against him. It is not clear that Rule of Disciplinary Enforcement no. 206, effective February 8, 1981, mandates the hearing committee to look beyond

the specific charges of misconduct as set forth in the petition; respondent has not at this point been given opportunity to be heard on any other formal charges.

We have already discussed the alleged violation of D.R. 9-102(B)(4). The other charges relate to alleged violations of D.R. 1-102(A)(4); D.R. 6-101(A)(3): D.R. 9-102(A), which we will now consider separately.

D.R. 1-102(A)(4) prohibits conduct involving dishonesty, fraud, deceit or misrepresentation. There is nothing in evidence to substantiate any charge of misconduct on any of these grounds. [Respondent's] problem was financial; he had permitted a non-lawyer access to trust funds in violation of the Canons of Ethics and Disciplinary Rules and he was previously disciplined for this. Because [C] had misappropriated clients' funds, [respondent's] office could not or did not pay [A's] bill to the client, who was unaware of this until [respondent] told her some four years later. At this time, [respondent] frankly told her that the bill had not been paid because [C] had misappropriated her money, and he gave her cash to cover the delinquent bill. As soon as [A] demanded payment from the client for the first time, [respondent] told her to pay the bill with his cash. Apparently the client is satisfied. As to her, where is the dishonesty, fraud, deceit or misrepresentation? As to [A], is there evidence of anything beyond the mere non-payment of his bill? We think not.

[A] did not appear at the hearing, so we have no evidence bearing upon [respondent's] conduct relating to him. Having been paid in full, [A's] interest in [respondent's] conduct is no longer evident, and we are left with only conjecture. Why did [respondent] pay [A] by the circuitous route of giving cash

to the client to hold until some future date, when [respondent] had acknowledged his liability to [A] as early as June 15, 1977? Why did he wait nearly five years to make payment? Where is [A]?

D.R. 6-101(A)(3) forbids a lawyer to neglect a legal matter entrusted to him. As between the client and [respondent] there is no evidence of neglect not the subject of previous disciplinary action. The client's affairs were handled by [C] in 1975 who withheld moneys in trust to pay [A] and then failed to do so. It is not clear when the matter first came to [respondent's] attention personally, but Paragraph no. 16 of the petition, with annexed Exhibit "B" entered into evidence by stipulation reveals that [respondent] knew of [A's] bill early in October of 1975; he ackowledged to [A] his responsibility no later than June 15, 1977 paragraph no. 19 of the petition entered into evidence by stipulation. [Respondent] told the client in 1979 that he did not pay the bill because [C] had "made off with the money" and, indeed, at some point there was less than $443.50 in [respondent's] trust account. At all times [respondent] tried in his way to protect the client from the results of his delay. He brought it to the client's attention and promptly furnished her with funds to pay the bill when she received the first demand upon her for payment. As noted above, [respondent's] conduct may not be without reproach, but we do not believe that it demonstrates neglect to warrant further disciplinary action.

D.R. 9-102(A) mandates that clients' funds, other than advances for costs and expenses, be "deposited" in one or more identifiable bank accounts and not be commingled in a bank account with the lawyer's funds, with certain exceptions not applicable to this case. It is clear that [B's] funds were deposited in such an account, designated as

"Trustee Account, [respondent], [C]." [Respondent] has already faced disciplinary action for permitting [C's] access to this account. We are not aware of any requirement that each client's funds must be deposited in a separate trust account and we believe it to be common practice in the legal profession to commingle clients' funds in one or more trust accounts. There is no evidence that [respondent] commingled the client's funds with his own. There is clear evidence that he did not *maintain* this client's funds in such an account because he permitted the bank balance to fall from $1,700.30 on October 20, 1975 to below $443.50, but D.R. 9-102(A) only mandates that such funds be "deposited" in a separate account, and they were so deposited. Perhaps the Disciplinary Rules do not address the problem of subsequent misuse of the client's funds; certainly D.R. 9-102(A) does not. It was promulaged under Canon 9 specifically EC9-5 relating to "separation" of clients' funds from attorneys' funds. In any event, there is no evidence that [respondent] appropriated any for his own use or commingled any with his own funds.

Finally, D.R. 9-102(B)(4), as noted above, mandates that the attorney shall "promptly pay or deliver *to the client as requested by the client* funds . . . in the possession of the lawyer which *the client* is entitled to receive." At no time did the client request payment to her. In fact, she never requested payment to [A] unless you consider her tacit approval of the 1975 settlement prepared by [C] such a request. Once again we must note that this particular Disciplinary Rule restricts itself to the lawyer's failure to pay client's funds to the client upon the client's demand and it does not extend to the lawyer's failure to make timely payment to others with or without the client's demand.

## V. CONCLUSIONS OF LAW

1. [Respondent] has not violated D.R. 1-102(A)(4) as charged.

2. [Respondent] has not violated D.R. 6-101(A)(3) as charged.

3. [Respondent] has not violated D.R. 9-102(A) as charged.

4. [Respondent] has not violated D.R. 9-102(B)(4) as charged.

## VI. RECOMMENDATION

The undersigned hearing committee recommends that the petition for discipline be dismissed.

The term of hearing committee member [   ] having expired since the hearing date, he joins in this report pursuant to Disciplinary Board authorization under D.R. 206(a), as amended effective February 8, 1981.

### ORDER

HARRINGTON, *Chairman*, And now, January 29, 1982, the report and recommendation of hearing committee [   ] dated November 23, 1981, finding that no violation had been established and that the petition for discipline be dismissed is accepted; and it is ordered and decreed that the charges against [respondent] be dismissed.